EXHIBIT "F"

```
1                 UNITED STATES   DISTRICT COURT

2                 CENTRAL DISTRICT   OF CALIFORNIA

3   _____)
    LEONELA ARACELY VALDEZ,  )
4   HERRERA,                 )
                             )
5         Plaintiff,         )
                             )
6     vs.                    ) Case No. 2:17-cv-1136
                             )
7   FIRST NATIONAL BANK OF   )
    OMAHA, N.A.,             )
8                            )
          Defendant.         )
9   _____)

10

11

12         Deposition of SCOT MAYO, taken before Celeste

13  Mack, RPR, General Notary Public within and for the

14   State of Nebraska, at Thomas & Thomas Reporters, 1321

15   Jones Street, Omaha, Nebraska, on Thursday, October 12,

16   2017, commencing at 12:53 p.m., pursuant to the Nebraska

17   Supreme Court Rules.

18

19

20

21

22

23

24

25
```

Scot Mayo                                                                 2
10/12/2017

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:              (Telephonically)
      MATTHEW A. ROSENTHAL
 4  Attorney at Law
      Westgate Law
 5    15760 Ventura Boulevard, Suite 880
      Los Angeles, California 91436
 6    (818) 200-1497
      matt@westgatelaw.com
 7

 8    FOR THE DEFENDANT:
      CORY J. ROONEY
 9  Attorney at Law
      Law Office of Cory J. Rooney
10    Post Office Box 382
      Omaha, Nebraska 68101-0382
11    (402) 933-9865
      rooneylaw@outlook.com
12
      AARON LAMSKI
13  Attorney at Law
      First National Bank of Nebraska
14    1620 Dodge Street, Stop 3290
      Omaha, Nebraska 68197
15    (402) 636-6813
      alamski@fnni.com
16

17

18

19

20

21

22

23

24

25
```

Scot Mayo                                                                                  3
10/12/2017

 1                         I N D E X

 2

 3   CASE CAPTION. . . . . . . . . . . . Page   1
     APPEARANCES . . . . . . . . . . . . Page   2
 4   INDEX . . . . . . . . . . . . . . . Page   3
     TESTIMONY . . . . . . . . . . . . . Page   4
 5   REPORTER CERTIFICATE. . . . . . . . Page  27

 6 EXAMINATION
         Direct by Attorney Rosenthal . . . Page   4
 7

 8

 9

10                       E X H I B I T S

11   No.    Description                    Page No.

12    1     Computer Screen Shot                4

13    2     Activity Phone Log                  4

14    3     6.25 Collection Admin Queues        4

15

16

17

18

19

20

21

22

23

24

25

Scot Mayo                                                                                    4
10/12/2017

```
 1          (Whereupon, the following proceedings were had,

 2   to wit:)

 3                              (Whereupon, documents were

 4                              marked as Deposition Exhibit

 5                              Nos. 1 through 3 for

 6                              identification.)

 7                      SCOT MAYO,

 8                having been produced and

 9             first duly sworn as a witness,

10                 testified as follows:

11                  DIRECT EXAMINATION

12  BY ATTORNEY ROSENTHAL:

13     Q. Could you state your name for the record, please.

14     A. My name is Scot, S-C-O-T, Mayo, M-A-Y-O.

15     Q. Thanks.

16        Now, have you given a deposition before?

17     A. Yes, sir, I have.

18     Q. Okay. And just so we're clear, I'll just go over

19   general ground rules. I mean, they're the same for

20   every deposition, but as you know you were just sworn by

21   the court reporter, so any testimony you give today is

22   under oath and it's essentially the same as if we were

23   at trial, do you understand?

24     A. I do.

25     Q. Okay. And the other thing, when you're giving a
```

1    response to an answer, if you could, you know, respond

2    yes or no, as opposed to ah-ha, just because when we do

3    the transcript it's -- it can be difficult sometimes to

4    see if it's an affirmative answer or not, is that okay?

5        A. Yes, sir, I understand.

6        Q. Okay, great.

7            So what is your current position?

8        A. I am a senior manager in charge of the collection

9    administration and recovery area of First National Bank.

10       Q. Okay. And how long have you been employed there?

11       A. Been employed 17 and-a-half years.

12       Q. Okay. And so you've had the same position for 17

13   and-a-half years?

14       A. Yes, sir.

15       Q. Okay. And now, what does your -- what are your

16   general job duties?

17       A. I manage the segments of the bankruptcy, the

18   collection litigation and the recovery area of the bank

19   card division, along with acting as a keeper of the

20   records.

21       Q. Okay. So there are other divisions as well in

22   addition to bank cards that you're not involved with?

23       A. I'm not sure I understand the question.

24       Q. So you only work for the collections for the bank

25   card division?

1      A. The credit card -- correct, the bank card, or the

2    credit card division.

3      Q. Okay. Okay.

4          Now, so -- I'm sorry, collection supervisor is

5    your job title?

6      A. Recovery supervisor.

7      Q. Recovery supervisor, okay.

8          So are you generally familiar with the Fair Debt

9    Collection Practices Act?

10     A. Yes, sir.

11     Q. Okay. And are you familiar with the Telephone

12   Consumer Protection Act?

13     A. I am familiar with it, yes, sir.

14     Q. Okay. And just for ease of the deposition, if I

15   can just refer to those as acronyms, FDCPA, TCPA, you

16   understand?

17     A. Yes, sir.

18     Q. Okay, great.

19         Now, in the collection's department you have --

20   do you have specific collectors that you employ,

21   individuals that assist in the collection of accounts?

22     A. Yes, sir.

23     Q. Okay. So your collectors, are they employees of

24   the bank or are they independent contractors?

25     A. These are employees of the bank.

1     Q. Okay. Do the collectors go through any specific

2  training process regarding the FDCPA?

3     A. Yes, they do.

4     Q. And what does that process entail?

5     A. It's an annual training of the FDCPA.

6     Q. Okay. Does the training, is it -- does it

7  include tests? How are they -- what does that training

8  entail?

9     A. It is, I believe, if I recall correctly, it's

10  a -- it's a two, three-hour classroom training,

11  refamiliarization for annual -- current employees, a

12  three-hour training for new employees and then a test

13  afterwards.

14     Q. Okay. So it's -- it's basically like a half day

15  course with a test at the end, is that accurate?

16     A. That -- it would be a fair assessment, yes.

17     Q. Okay. And approximately how many collectors do

18 you have employed right now?

19     A. I'm going to say not -- not knowing in the exact

20  number, north of 180.

21     Q. Okay. Are they all in the same location, or are

22  there different locations throughout the country?

23     A. We have a location in Yankton, Y-A-N-K-T-O-N,

24  South Dakota; and Wayne, Nebraska.

25     Q. Okay. Now, I want to ask some questions

1 generally regarding the computer system that your

2  company uses to place collection phone calls. So are

3 you prepared to answer some questions about that system?

4     A. Computer system?

5     Q. Yes.

6     A. I will do my best, yes.

7     Q. Okay. Specifically regarding the dialing system

8  that is used to place collection phone calls, are you

9  familiar with the system that your --

10     A. To a certain extent, yes.

11     Q. Is there anyone else at your company who would

12  have more information regarding that?

13     A. Not -- not that I can recall at the moment, no.

14     Q. Okay. So are the collection calls placed with a

15  computer system?

16     A. Not 100 percent of the calls are placed with a

17  computer system. There are also calls placed manually.

18     Q. Okay. So of the calls that are not placed

19 manually, what is the system that is used?

20     A. It's called the AVAYA system.

21     Q. Okay. And AVAYA is A-V-A-Y-A, correct?

22     A. Yes.

23     Q. Is it AVAYA Proactive Contact 5.1?

24     A. Yes.

25     Q. Okay. Now, that system, is that a predictive

1   dialer?

2              ATTORNEY ROONEY: I'm going to object to

3   form and foundation of this witness. But you can go

4   ahead if you know the answer.

5              THE WITNESS: Not sure I understand your

6   definition or what you're defining as a predictive

7   dialer.

8 BY ATTORNEY ROSENTHAL:

9      Q. Okay, do you know what a predictive dialer is?

10     A. Not really. What are you -- what are you --

11  you're asking me is it a predictive dialer. What are

12  you defining a predictive dialer?

13     Q. I can give you a definition of it. Give me one

14  second. These are also included in our discovery.

15         Okay, let me just circle back to this later,

16  okay?

17     A. Okay.

18     Q. Now, just generally regarding the system, how is

19  it determined which phone numbers are called?

20     A. It is based on the delinquency -- date of

21 delinquency on the account or number of days delinquent

22  the account is, available account numbers and whether or

23  not we have consent to dial certain cell phone numbers.

24     Q. Okay. So if a -- if a -- someone falls

25  delinquent on an account, how -- how does that

1   information get into the computer? Does someone

2 manually type that in or how does the computer know who

3   to call?

4              ATTORNEY ROONEY: I'm going to object to the

5   form. You can go ahead.

6              THE WITNESS: Every morning we run a -- we

7   run a sweep of our accounts to identify days delinquent,

8 the account number involved and the phone numbers that

9 we have available to call, and then they are queued into

10   the system.

11              Now the sweep includes, are they land lines,

12   have we got consent to call if it is identified as a

13   cell phone number, and then we -- we will turn around

14   and schedule those to be called.

15 BY ATTORNEY ROSENTHAL:

16     Q. Okay. So you basically have a list of people

17   that are then loaded into the dialer and then those

18   people are called if they're not swept out by your

19   criteria that you just mentioned?

20              ATTORNEY ROONEY: I'm going to object to the

21   form.

22              THE WITNESS: That -- based on what you

23   stated, I would agree with the way you just described

24   it.

25 BY ATTORNEY ROSENTHAL:

1      Q. Okay. Now, in terms of initiating the call, does

2    the system initiate the call or does -- do the

3    collectors initiate it?

4      A. I -- we have to -- we trigger the calling to

5    start, and then the system will dial the accounts loaded

6    into it.

7      Q. When you mean "we", you mean the individual

8    collection agent or someone else?

9      A. No, the -- the supervisor working over that

10   collection unit. Say the accounts are 35 to 59 days

11   delinquent --

12     Q. Okay.

13     A. -- the supervisor for that unit will turn around

14   and tell the system to -- once the agents have logged

15   in -- will tell the computer to start the calling

16   process.

17     Q. Okay. So that -- in other words, the -- the

18 manager sets up the system, and then as soon as that

19   system is initiated then the system begins placing the

20   calls?

21     A. Correct.

22     Q. Okay. So it's -- okay.

23        Okay, if you can look at Exhibit A. Let me know

24   when you have it. Okay, do you recognize this document?

25     A. I do. It is a -- it's a screen capture or a

1   screen print of part of our collection bank system,

2   system of record.

3       Q. Okay. Is this in any way connected to the

4   dialing system that we were discussing before, or is

5   this separate?

6       A. No, sir, this is separate.

7       Q. Okay. Now, on here, this is the account

8   information for my client, Miss Valdez, correct?

9       A. Correct.

10      Q. Okay. And she is the only individual listed on

11  this account, correct?

12      A. Correct.

13      Q. Okay. And here I'm still looking at the first

14  page, I see two phone numbers, a home phone and a

15  business phone; is that correct?

16      A. They are identified as such, yes.

17      Q. Okay. Is there any, I guess, entry here for a

18  cell phone.

19              ATTORNEY ROONEY: I'm going to object to the

20  form.

21              THE WITNESS: No, sir.

22  BY ATTORNEY ROSENTHAL:

23      Q. Okay. We can skip ahead to page five here. You

24  see the page numbers are on the top, I guess, left. You

25  see here we have the one entry that's highlighted. This

1    is actually highlighted when it was produced to me, so.

2    But here in this second column, you see where it says

3    "type"? What does that refer to?

4        A. Type is a type of memo that was placed on the

5    account.

6        Q. Okay.

7        A. Case and point is if you -- on page 5, the type

8    for underneath that on page 5, it says L as in Larry,

9    5112.

10       Q. Yes.

11       A. We're on the same page?

12       Q. Okay.

13       A. L-5112 is basically, the type of transaction or

14   type of notation on the system is a letter, and the

15   letter number is 5112, and the description that we have

16   for that letter is it's a close letter due to the

17   account delinquency, or closed due to delinquency.

18       Q. Okay. And so right below that one, where it says

19 M, what does the M refer to?

20       A. Miscellaneous memo.

21       Q. Okay. Is that something that would need to be

22 manually typed in or is that automatically posted to the

23   account?

24       A. It would be manually typed in.

25       Q. Okay. And who would -- who types -- who types in

1   on these accounts, if that question makes sense?

2       A. The collector would type into the account.

3       Q. Okay. So if a -- if an individual collector,

4   let's say, is on the phone with someone, they would have

5 access to the system and they would be able to make --

6 manually type in notes, correct?

7       A. Correct.

8       Q. Okay.

9       A. If I can clarify, based on this, just so that

10   we're all on the same page.

11      Q. Sure.

12      A. Your Exhibit B, our Exhibit 2, the second half of

13 the memo that you just referred here in your questioning

14   to me, the first half of the memo, as well as this

15   second line are also on page three of your Exhibit B, my

16   Exhibit 2, and it basically indicates that the first

17   part of the memo was part of the action as a result of

18   the outbound dialing, call telephone 1, "gal answered

19   and said stop calling me, then she hung up."

20      Q. Okay.

21      A. And the miscellaneous memos here, the first part

22   of the memo was on the collection platform that when an

23   account charges off, it goes into a -- a suspense or a

24   none, what we call a purge memo, not purge delete, but

25   just purged off of the main system because they're

1    collection memos.

2       Q. Okay. Okay, so these are both all part of one

3    conversation then?

4       A. That is correct. Because if you look at page

5    three of memo -- or of the -- of Exhibit 2, or Exhibit B

6    on your side, the time stamp is -- the first part of

7    that memo was time stamped at 2112, 43 seconds, and this

8    second was 2312, and the times are off by seconds. Go

9    figure, computers.

10      Q. Okay.

11      A. But I think you get what I mean.

12      Q. Yeah, I understand. I'm going to come back to

13   Exhibit B in just a couple minutes.

14         Turning back to A, if we can, if you could flip

15   ahead to page 16.

16      A. I'm there.

17      Q. Another -- okay. You there?

18      A. Yes.

19      Q. Okay. So here there are also two highlighted

20   entries. And under type for the first one, it says

21   MISIV, what does that stand for?

22      A. Miscellaneous entry, IVR.

23      Q. Okay. And then I'm also seeing here, ███████6948,

24   cards activated IVR, what does that mean?

25      A. When you get your credit card, it comes in a

1   pouch. And included in that is the plastic or the plate

2   itself with a sticker on it and your card member

3   agreement and a cover letter. You -- you read the terms

4   and agreement to make sure you're in agreement with it.

5   If you do, then you call the number on the sticker on

6   your card to activate. If you don't want to deal with a

7   computer, you can actually punch out to talk to a phone

8   representative.

9          But in this particular case they dialed the

10  number, answered whatever the criteria was the computer

11  requested, and then activated the card, which is why it

12  references cards were activated via the IVR.

13      Q. And IVR, that stands for interactive voice

14  recognition?

15      A. I'll be honest with you, I'm not sure. The

16  acronym I've known for the last 17 years is IVR.

17      Q. Okay, okay. And to your knowledge, is that -- is

18  IVR used in any collection calls?

19              ATTORNEY ROONEY: Objection to the form.

20              THE WITNESS: Oh, I'm sorry.

21  BY ATTORNEY ROSENTHAL:

22      Q. You can answer -- you can answer if you know.

23      A. Okay. Okay. It is not, to my knowledge, used in

24  collection calls. It is used for card activation. It

25  is used for telephone payments, where if they want to

1    call in to make a payment on the account, they punch in

2    their 16 digit account number, gives you the option.

3          And just as an example, option 2 will allow you

4    to make a payment by telephone, and then you key in the

5  AVA routing number off the bottom of the check, the

6  checking account number off the bottom of the check and

7    the dollar amount you want to pay. It's a bypass a

8  human being if they want to do it that way.

9      Q. Okay. Okay. Now, back looking at the exhibit

10    again, the second entry here that's highlighted, type is

11    listed as YADRX. What does that stand for?

12      A. I honest --

13            ATTORNEY ROONEY: Matt, just for

14    clarification, I'm looking at Scot's copy and there's --

15    his document is not highlighted, so if you can tell him

16    roughly where it is on the document.

17            THE WITNESS: No, I know where it's at, I

18    just for the life of me can't remember -- can't remember

19  what it is other than it is -- it was part of the

20    application process and those were the numbers that were

21    provided during the application process.

22            ATTORNEY ROSENTHAL: Okay.

23            ATTORNEY ROONEY: And I'm just making a

24    comment because there is a couple of those YADRX

25    entries, just so he's looking at the same one as you.

1              ATTORNEY ROSENTHAL: Oh, okay. Yeah, it's

2    just when I printed it out the highlighting showed up,

3    so I'm not sure. Maybe it just didn't when it was

4    printed out there. But that's fine.

5 BY ATTORNEY ROSENTHAL:

6    Q. Okay, now we can turn back to Exhibit B, or

7    Exhibit 2, I guess. I just want to go over the columns

8    here. Some of them are obviously pretty

9    self-explanatory, date, time and corp, which is the

10   First National Bank, account number, which is my

11   client's account number. These are all pretty

12   straightforward to me.

13       Now, if you look at the third column, acting

14   collector, what does that -- what do these codes

15   signify?

16   A. It would signify if there was a -- possibly a

17   system memo, a platform activity. Using as an example

18   the first -- on the first page, the first item was

19   actually a payment that was taken via the system, web

20 payment, so they accessed the account online and made a

21   payment, or I believe that's -- not the IVR, just that

22   they made a payment.

23       So if it's other than a -- any type of contact

24   that is made is normally -- signifies who made it,

25 whether it was a collector making an outbound call,

1    whether it was just a system, if it reaches a certain

2    point within the life cycle of the account that triggers

3    an activity, the account falling past due, the L-5112

4    letter going, et cetera, et cetera, those will be --

5    those will be references as to what -- who initiated the

6    action. And then the activity code is, you know, what

7    was the action.

8        Q. Okay. Obviously I don't want to go through every

9    single one because a lot of them are not really

10   pertinent to the case here, so in other words, this is

11   basically a summary of every communication on the

12   account, whether someone makes a payment or a letter

13   goes out or inbound call, an outbound call, it would all

14   show up on this document?

15       A. That's correct.

16       Q. Okay. I want to skip to page three, right where

17   we were just looking before, that you identified that

18   one call on January 4th. The note says, "gall answered

19   and said -- or SD stop calling me."

20           So here on this account, on this entry, on the

21   third column it's W-282W. What does that signify?

22       A. That represents a -- that identifies collector

23   number 282 out of the Wayne collection site, W is for

24   Wayne. You'll see others on there, Y is for the Yankton

25   site.

1      Q. Okay. And then the next column is T1NML, and

2    what does that signify?

3      A. Telephone number 1, no message left.

4      Q. Okay. So, in other words, this is -- this is an

5  outbound call that was made to the first telephone

6    number listed?

7      A. That's correct.

8      Q. Okay. And then the one above it, as we discussed

9  before, these are all -- both part of this one phone

10    call. And the one above it has M for manual, correct?

11     A. Correct.

12     Q. Okay. So this notation, "gall answered and SD

13    stop calling me", is that also something that was

14    manually entered by the collector?

15     A. That is correct.

16     Q. Okay.

17     A. The reason it was -- just to help, the reason it

18    was on two lines is on our -- on our system there -- the

19    field for memos is only so many characters long, and as

20    a result it may be necessary to go to a second line; and

21    the first line indicates the action taken telephone

22    number 1, and then the second line is theoretically a

23    continuation of what transpired during the call.

24     Q. Okay. And then I'm looking at the activity after

25    that, if you go further down this page, and onto the

1    next page, the third column there you'll see the

2    notation AUTOY. And I -- can you explain again what

3    that is?

4        A. That would be a -- basically the computer dialed

5 the telephone number, it was passed to the agent and the

6    agent telephone -- like going down to, say, January 5,

7    AUTOY, telephone 1, no message left. Phone -- and then

8    they clarify -- or not clarify, they basically

9    elaborate, telephone 1, no message left, and then later

10   on -- well, I'm sorry, they are going, on the date, it's

11   going earliest in the day to latest in the day, so

12   they're going, how would I put it?

13       Q. I understand what you mean.

14       A. Okay, okay.

15       Q. To know to the date, you have to go back up --

16       A. Correct.

17       Q. -- earlier in the day, okay.

18           And sorry, I didn't mean to cut you of, if you

19   had --

20       A. No, no, no, I wanted to make sure that you were

21   following me.

22       Q. Yeah, I got that.

23       A. Okay.

24       Q. So when the computer dials the numbers, on the

25   field for -- so let me back up.

1        When a computer dials the phone number, is every

2    call connected to an agent, regardless of whether the

3    call was answered?

4     A. For certain states, yes, it is. Certain states,

5    California being one of them, requires an agent to be

6    present when the call connects.

7     Q. Okay. So in other words, the computer dials the

8  number and then their call is immediately transferred so

9     that the agent will hear, you know, the phone ringing.

10  And then if there is no answer, then the agent decides

11   whether to leave a message or not?

12    A. Correct.

13    Q. Okay. So if we're looking at this again, on page

14    three, and then again on to page 4, subsequent to that

15    January 4th call, each -- each of these entries that has

16    an AUTOY with it, those were calls that were placed by

17    the computer dialing system, correct?

18            ATTORNEY ROONEY: Objection, form.

19            THE WITNESS: In conjunction with, yes.

20  BY ATTORNEY ROSENTHAL:

21     Q. Okay. In other words, those are all calls where

22     the computer dials the number, and then as soon as the

23  number was dialed it was transferred over to an agent?

24    A. Correct.

25     Q. Okay. I want to move ahead to Exhibit 3, which I

 1  marked as C. Did you have it?

 2      A. Yes, sir.

 3      Q. Can you identify this for me?

 4      A. Looks like page -- page out of our collection

 5  manual addressing cease and assist and validation for

 6   processes and procedures.

 7      Q. Okay. And I'll just read the first couple

 8   sentences here. "When we receive a cease and assist

 9   letter signed by the cardholder to stop calling them or

10   to correspond in writing only, we memo the comments and

11   give the letter to our supervisor. When we are told

12   verbally to cease and assist, take a copy to your

13   supervisor."

14          Now, in this case there were verbal cease and

15   assists?

16              ATTORNEY ROONEY: Objection, form.

17              THE WITNESS: I -- in preparation for this I

18   listened to the call again last night, the 29 seconds

19   total for the call, and I believe you have a copy of it,

20   nowhere in there did your client identify herself as

21   your client -- or pardon me, identify herself, or

22   confirm or acknowledge who -- who she was.

23              There was just a statement from a female

24   that said please stop -- or stop calling me and

25   terminated the call. We don't make presumptions or

1   assumptions.

2 BY ATTORNEY ROSENTHAL:

3      Q. Okay. I wasn't asking you to make a presumption,

4   but the call, if you look again at the account notes,

5 which we just went over, there is a memo in there by the

6   collector that states, "gall answered and SD stop

7   calling me", correct?

8      A. Correct.

9      Q. Okay. So if that is the case, why did the calls

10  continue after that?

11     A. You're asking me to make a presumption on whether

12  or not we actually spoke with the cardholder, sir, I

13  can't do that. And a collector is not going to do that.

14  The collector needs to confirm that we are talking with

15  the cardholder, not somebody else living at that

16  address, not somebody else that's in possession of the

17  telephone.

18        I mean, it could have been -- it could have been

19  a jilted lover for all we know. I don't know -- we

20  don't know who it was on the other end of the phone.

21     Q. Okay. And so because you could not affirmatively

22  identify that it's being my client who answered, then

23  the calls continue?

24     A. Yes, sir.

25     Q. Okay.

1          ATTORNEY ROSENTHAL: Okay, I think we're

2    about done honestly. Do you want to take five minutes

3  and I can look over some stuff? And if I have any other

4    questions, I'll let you know.

5          ATTORNEY ROONEY: That would be fine, Matt.

6          ATTORNEY ROSENTHAL: Okay, let's do that.

7    I'll just stay on the line. We'll come back in about

8    five minutes.

9          (Recess.)

10          ATTORNEY ROSENTHAL: All right, just a

11   couple quick questions.

12 BY ATTORNEY ROSENTHAL:

13      Q. If we could flip back to Exhibit 1.

14      A. I'm here.

15      Q. Okay. So again there's the two phone numbers,

16 the home phone and the business phone. The home phone

17   here is listed ███████-6948, correct?

18      A. That is correct.

19      Q. Okay. And then when we were discussing on

20   Exhibit 2, the calls that were placed, and you referred

21   to those as telephone number 1, that phone number is the

22   home phone, correct?

23      A. That is correct.

24      Q. Okay.

25          ATTORNEY ROSENTHAL: That's all I have.

Scot Mayo                                                                                    26
10/12/2017

```
  1               So Corey, did you want to do a stipulation.

  2               ATTORNEY ROONEY: As far as what?

  3               ATTORNEY ROSENTHAL: As far as reviewing the

  4     transcript or anything like that?

  5               ATTORNEY ROONEY: He's probably going to

  6     read and sign, but other than that we're fine.

  7               ATTORNEY ROSENTHAL: Okay. That's fine with

  8     me too. So yeah, if there are any changes, just make

  9     them and send them to me. I don't expect that there

 10     will be, but if there are to the transcript, just let me

 11     know.

 12               ATTORNEY ROONEY: Okay, will do.

 13               (Attorney Rosenthal confirmed on record

 14     electronic copy.)

 15               (The deposition concluded at 1:33 p.m.)

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

```
 1                    C E R T I F I C A T E

 2

 3                      STATE OF NEBRASKA   :

 4     DOUGLAS COUNTY           :

 5

 6              I hereby certify that the foregoing

 7     transcript was taken down, as stated in the caption, and

 8     the questions and answers thereto were reduced to

 9     typewriting under my direction; that the foregoing Pages

10     1 through 27 represent a true and correct transcript of

11     the evidence given upon said hearing, and I further

12     certify that I am not of kin or counsel to the parties

13     in the case; am not in the regular employ of counsel for

14     any of said parties; nor am I in anywise interested in

15     the result of said case.

16              This, the 16th day of October 2017.

17

18              _____
                       Celeste Mack, RPR
19

20

21

22

23

24

25
```